**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Obeidalla Birair, et al., | No. CV-15-01807-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Edmond Kolycheck, et al., | |
| Defendants. | |

This matter is before the Court on a number of Motions filed by the parties.[1] Defendant Officer Jason Flam ("Officer Flam") filed a Motion for Summary Judgment and corresponding Statement of Facts (Docs. 71 and 72). Plaintiffs filed a Response and Officer Flam filed a Reply (Docs. 93 and 98). Defendants Candida Carrion, Edmond Kolycheck, Sarah Kramer, Sybil Padmore, and Amanda Torres (the "State Defendants") filed a Motion for Summary Judgment and corresponding Statement of Facts (Docs. 80 and 81)[2]. Plaintiffs filed a Response and the State Defendants filed a Reply (Docs. 91 and 99). Lastly, Plaintiffs filed a Motion for Partial Summary Judgment (Doc. 75)[3]. The

---

[1] All parties requested oral argument on their respective Motions. The Court denies the requests because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed.R.Civ.P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

[2] The Court notes a number of spelling and grammatical errors, in addition to incorrect citations to law and the record in the State Defendants briefing, which has unnecessarily added to the complexity of this case.

[3] The Court notes violations of this District's Local Rules in the number of pages that were submitted by Plaintiffs on the various Motions and Responses. Plaintiffs' Motion for Summary Judgment is 27 pages long. (Doc. 75). Plaintiffs' Response to Officer

State Defendants and Officer Flam filed Responses to that Motion and the Plaintiffs filed a Reply (Docs. 88, 90, and 97).

**I.      Background[4]**

The material facts are not in dispute.  Plaintiffs Obeidalla and Intisar Birair are parents to five minor children, referred to herein as Mo.B., A.B., Hy.B., Mu.B, and Ha.B. (Doc. 76 at 1).  On September 11, 2014, the date of the incident in question, Mo.B., a son, was nine years old; A.B., a son, was six years old; Hy.B., a daughter, was four years old; Mu.B, a son, was three years old; and Ha.B., a daughter, was two years old.  (*Id.*) The eldest child, Mo.B., was diagnosed with autism at some point in 2010.  (*Id.*)

This case stems from the removal of Obeidalla and Intisar Birair's five children by Arizona Department of Child Safety ("DCS") officials on September 11, 2014.  On that day, DCS employees Kolycheck and Kramer went to Plaintiffs' home.  (SOF ¶ 1).[5]  DCS had received reports related to the Birairs not adequately supervising their children as early as 2011.  One report received alleged that one of the Birair children had been found unsupervised and undressed in the middle of an intersection, and that another child had fallen into the family's pool, nearly drowned, and was taken by ambulance to the hospital on September 10, 2014.  (SOF ¶ 3).

Prior to the removal, DCS employees had several encounters with the Birair family, specifically with regard to Mo.B., the eldest Birair child.  DCS' Comprehensive Child Safety and Risk Assessment report identifies numerous incidents involving reports to their office about the Birair family and investigations DCS conducted as a result of

---

Flam's Motion for Summary Judgment is 21 pages long, and their Response to the State Defendants' Motion for Summary Judgment is 25 pages long.  (Docs. 91 and 93). According to LRCiv 7.2, "Unless otherwise permitted by the Court, a motion including its supporting memorandum, and the response including its supporting memorandum, may not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts."  LRCiv 7.2(e)(1).  Plaintiffs did not obtain permission from the Court to file additional pages.  Therefore, only the first 17 pages of Documents 75, 91, and 93 will be considered by the Court.

[4] All references to the Complaint are to the First Amended Complaint.  (Doc. 27).

[5] Officer Flam's Statement of Facts (Doc. 72).

- 2 -

those reports. (Doc. 76 at Ex. 8). The reports concern, almost exclusively, incidents related to Mo.B.

The first documented report dated May 3, 2011, states that "[d]ue to his disability, [Mo.B.] does not recognize dangerous situations, and he exhibits risk taking behavior." (Doc. 76-8 at 3). This statement was made in response to a report from a member of the public that Mo.B. was jumping on a bed near an open second-story window that did not have a screen on it. The report states that Mo.B. did not sustain any injuries and no services were provided to the family as a result of the incident. (*Id.*)

An August 8, 2014, report states that "[Mo.B.] was found running naked down the middle of the street on Thomas . . . Once law enforcement had arrived the parents had already found [Mo.B] and took him home." (*Id.*) Law enforcement confirmed to DCS employees after the August 8, 2014 incident that they had received a similar call with respect to Mo.B. on May 19, 2013. On that date, Mo.B. was found in the middle of the intersection of McDowell Road and 63rd Street. (*Id.*) An entry by DCS employee Sarah Opuroko ("Opuroku") states related to the August 8, 2014 incident that Mo.B. "appeared fine and did not have any injuries." (*Id.*) Also observed on this day was that the "pool Mo.B. was playing in was not fenced in." (*Id.*) A report from this day concludes that "[e]ach of the children presented with no marks or bruises and were appropriately dressed." (*Id.*) Moreover, the report states "the home was messy, but there were no immediate safety concerns." (*Id.* at 9). There was no additional follow up by DCS employees related to this visit. (*Id.*)

On August 29, 2014, DCS employees conducted a 2014 home visit after receiving reports of Mo.B. running in and out of an intersection naked. (Doc. 76-8 at 7). After arriving at the home, employees noted that Mo.B. was no longer in the street but had been brought home. The report as to the visit of the home states that "[t]he home appeared chaotic with all the kids running around for the duration of the visit. Mother and father appeared to have a difficult time controlling the children." (*Id.*) As to the state of Mo.B., the report states that he "was observed with no marks or bruise [sic], but

was naked for the duration of the visit." (*Id.* at 6). The report states that Mrs. Birair opined that their neighborhood contains "a lot of older individuals and they are not used to having children around playing. She stated she feels segregated and judged by the people that live in her neighborhood." (*Id.* at 9). There was no additional follow up by DCS employees related to this visit. (*Id.*)

## A.    Removal of Children

On September 10, 2014, the Mesa Police Department was dispatched to the Birair home after 911-dispatch received a call regarding a child who had fallen into the swimming pool. Mu.B. had fallen into the pool and was submerged under the water. Mr. Birair jumped into the pool and pulled Mu.B. out of the water, pushing on Mu.B.'s chest in order to clear the airway of water. As a precaution, Mu.B. was taken to the hospital for observation. Mrs. Birair travelled to the hospital along with Mu.B. Mr. Birair remained at home with the other four children. Mrs. Birair remained in the hospital overnight with Mu.B. on the evening of September 10, 2014, and he was released the next morning.

On the evening of September 10, 2014, DCS employee Opuroku, while working the overnight shift, visited the home and reported that she observed the four children in the home. (Mu.B. remained in the hospital overnight with Mrs. Birair). (Doc. 76-8 at 14). Her report states that "[a]ll four children were sleeping and the father lifted blankets off so [she] could observe their arm, legs, and face. All four children appeared healthy, well-nourished, were dressed appropriately, and were clean." A report filed by Opuroku, after her visit to the Birair home states in a report titled "Assessment of Present Danger" that all of the "children appear healthy, and present with no visible injuries. The home was clean and appropriate, the parent [sic] plan on putting a fence around the pool. At this time, there are two doors with keys and parent [sic] are the only ones with key to the backyard." (Doc. 76-8 at 14). Opuroku took no action to remove any of the children from the home on September 10, 2014.

Kolycheck's report related to this incident states that he had "severe concerns about the ability of the parents to manage and supervise the children. Parents do not seem

to function in an expected manner." (Doc. 76-8 at 3). His report further states that he had been to the home on multiple occasions and that the "children seem to be out of control," and that one of the children was observed "in the family Mercedes eating chocolate." (*Id.*)

On September 11, 2014, at approximately 2:30 p.m., DCS employees Kolycheck and Kramer, a newly hired DCS employee shadowing Kolycheck, arrived at the home to interview the Birairs related to the swimming pool incident. At the time they arrived, Mrs. Birair was still at the hospital with Mu.B. Kolycheck's report states that when Mrs. Birair arrived home, he expressed concerns about the "lack of supervision leading up to the point of [Mu.B.] nearly drowning, and also expressed concerns about what had occurred prior with [Mo.B.] running around the neighborhood and busy intersection naked." (Doc. 76-8 at 10). In their depositions, both Kolycheck and Kramer state that they had not made the decision to remove the children prior to arriving at and observing the situation at the home that day. (Docs. 76-4; 76-5). Kolycheck called his supervisor, Amanda Torres, speaking to her about the reasons he believed the children should be taken into DCS custody. (*Id.*) Torres agreed that the children needed to be taken into DCS custody. (*Id.*) Kolycheck's report states that he told the parents that all five children would be removed from the home as a result of those concerns. His report states that after hearing this news the "parents became hostile and were talking to each other in Arabic." (*Id.* at 13).

The DCS employees provided Mr. and Mrs. Birair with a temporary custody notice and stated that they would be removing the children from the home. (Flam's SOF ¶ 6). It is undisputed that DCS did not have a warrant or other order from a court to enter the residence and take the children. Rather, DCS made the determination to take the children without a court warrant based on what they observed at the home that day. It is clear that the Birairs did not want DCS to remove the children and were confused as to the basis for DCS' authority to remove their children. (*Id.* at ¶ 7). At some point, the DCS employees felt that the Birairs had become confrontational, at which point Kramer

called the Mesa Police Department and reported that the Birairs were being confrontational and they would not allow DCS to remove the children. (*Id.* at ¶ 8). Mesa Police Officer Jason Flam was dispatched to the home. (*Id.*) When Officer Flam arrived, the Birairs requested to see a court order. (*Id.* at ¶10). Kramer showed them the temporary custody notice that had been drafted by Kolycheck.

Flam instructed the Birair parents to remain on the driveway as Kramer and Kolycheck went inside the home to remove the children. Mr. Birair stated that he was going to enter the home and started walking toward the front door. (Doc. 76 at 10). As a result of Mr. Birair not following his previous instructions to remain outside on the driveway, Flam removed his Taser, pointed it at Mr. Birair, and ordered him to lie on the ground. (*Id.*) Shortly thereafter, a second Mesa Police Department Officer arrived at the home, handcuffed Mr. Birair, and placed him in the back of a squad car.[6] At that point, Kolycheck and Kramer entered the home and began the process of removing the children. The children were then placed in vehicles and taken away from the residence.

On September 17, 2014, Kolycheck authored and verified the Dependency Petition that was filed with juvenile court by the Office of the Arizona Attorney General. This Petition sought a finding of dependency as to the five Birair children. The Petition alleged:

> [The parents] are neglecting the children by failing to provide the children with the basic necessities, food, clothing, shelter, medical care and appropriate parental supervision. The parents have failed to properly supervise the children. The parents have allowed the oldest child [Mo.B.], age nine, to run around in public areas naked. The parents have failed to properly supervise the child [Mu.B.] by allowing him near an unfenced swimming pool where he fell in and nearly drowned. The parents are neglecting the children's special needs. The parents lock the children in their rooms in order to prevent them from running around the home.

(Doc. 76-1).

Other than the incident of Mu.B. falling into the pool, there are no specific reports as to any child other than Mo.B. Moreover, it is undisputed that there is no record of

---

[6] The second officer is not a party to this lawsuit. (Doc. 27).

Mo.B. being injured, or any record of any of the other four children being injured by Mo.B. Moreover, Kolycheck testified that there were no alternatives considered other than removing all of the children at that time, stating when asked whether alternatives were considered that "At the time, I do not recall, but I do not believe so either." (Doc. 76-5 at 14).

**B. Dependency hearing, continued detention, and return of the children**

In Kolycheck's September 21, 2014 report, ten days after the children were removed, in a section "Assessment of Risk Factors…and Need for Intervention," the report states that it is "in the best interest of the children to remain in DCS care until mother and father are able to accept responsibility and complete services that will benefit them as parents." (Doc. 76-8 at 15). Under the heading "Assessment of Impending Danger," Kolycheck states that the parents "admitted to leaving children unsurprised [sic]," and concludes that "[f]urther DCS intervention is need [sic] until the parents can come up with a plan to gain control and have a disciplinary system in the home." (*Id.*) At the bottom of the report under the heading "Safety Decision," Kolycheck states, "Unsafe - At least one child is in impending danger." (*Id.*)

At the Dependency hearing, the juvenile court found there was sufficient evidence to keep the children out of the home for an indefinite period of time. The Birairs claim they did everything asked of them in order to have their children returned to them. Candida Carrion ("Carrion") and Sybil Padmore ("Padmore") were involved in the Birair case post-removal. Both Carrion and Padmore made reports to the juvenile court, arguing that the children should not be returned to the Birairs. These reports continued over a number of months.

Over a year after all the children were removed on September 11, 2014, eventually, all five children were returned to their parents. A.B. and Ha.B. were returned to their parents on October 9, 2015. Mu.B. was returned to his parents on December 7, 2015. Mo.B. and Hy.B. were returned to their parents in late December 2015. There was never a finding of "dependency" over the children in the juvenile court.

## II.     Summary Judgment Standard

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986); *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The materiality requirement means "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Substantive law determines which facts are material. *Id.* The dispute must also be genuine, meaning the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. The Court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted. *Jesinger*, 24 F.3d at 1131.

The moving party bears the initial burden of identifying the portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits that it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party meets its initial burden, the opposing party must establish the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party. *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-250. However, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III.    Officer Flam's Motion for Summary Judgment

Plaintiffs assert two Section 1983 claims against Officer Flam in their Complaint, a Fourth and Fourteenth Amendment violation claim in connection with his alleged involvement in the removal of the children, and a Fourth Amendment claim for excessive force against Mr. Birair at the time of the removal. (Doc. 27). Officer Flam seeks

summary judgment as to each of these claims, arguing that he is entitled to qualified immunity because he did not use excessive force and his actions at the scene were objectively reasonable.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009)). "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 232, 129 S.Ct. 808).

Whether an officer's use of force is reasonable under the Fourth Amendment requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" as weighed against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) *quoting United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 (1983). "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (1989). However, it is well established that the right to make an investigatory detention carries with it the right to use some degree of physical coercion or threat. *See Terry v. Ohio,* 392 U.S. 1, 22–27

(1968). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97 (1989).

To assess whether an officer was reasonable in his actions, a court must first assess the severity of the intrusion on the individual's Fourth Amendment rights "by evaluating the type and amount of force inflicted." *Miller v. Clark County,* 340 F.3d 959, 964 (9th Cir. 2003); *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003). Next, the court must "evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Miller, 340 F.3d at 964*; *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Lastly, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).

### A. Excessive Force

Plaintiffs argue that Officer Flam's pointing of his Taser at Mr. Birair was a use of excessive force and an unlawful "show of authority" that resulted in an unlawful seizure of Mr. Birair. (Doc. 93). Officer Flam argues that he did not use excessive force in his interactions with Mr. Birair. Officer Flam's testimony, which is supported by his body camera footage from the scene, is that he did not even touch Mr. Birair, much less use excessive force against Mr. Birair. (Doc. 103). Officer Flam testified that he was only at the scene to make sure that everyone, including the Birair parents, the children, and the DCS employees, stayed safe. The undisputed facts support this conclusion as to Officer Flam.

The undisputed facts establish that when Officer Flam arrived on the scene, he had been told by dispatch that the Birairs were confrontational with DCS employees who were attempting to take the children into custody. (Flam SOF ¶¶ 8-11). He had also been

told that the Biraris were preventing DCS employees from taking the children into custody and that one of the parents had stated that they would lock themselves in the home with the children to prevent DCS from taking the children. This limited information is all that Officer Flam had regarding the situation at the Birair home. When he arrived at the home and spoke with Kolycheck, this information was relayed to him a second time. (*Id.*) Based on his experience as a police officer, Flam knew that child removal situations can be dangerous, and Plaintiffs agree that these are situations that are emotionally charged and have the potential to become dangerous. (Flam SOF, Ex. 3 at 191:8-19).

When he arrived at the scene, Officer Flam instructed the Birair parents to remain outside the home on the driveway stating, "right now, for my safety, their safety, and everyone's safety, you're going to stay right here until my back up shows up." (Flam SOF ¶¶ 8-11). Mrs. Birair then stated "we are just going to lock ourselves with the kids inside." (*Id.* at ¶¶ 15). The situation escalated when Mr. Birair failed to follow Officer Flam's instructions to remain outside the home and started moving toward the front door in order to go inside the home. Officer Flam, fearing that Mr. Birair would barricade himself inside the home with the kids, and as a result of Mr. Birair not following his previous instructions to remain outside on the driveway, removed his Taser and pointed it at Mr. Birair, ordering him to lie on the ground. A second officer arrived shortly thereafter, handcuffed Mr. Birair, and placed him in the back of a squad car.

The facts here are not in dispute. While the parties did not cite any Ninth Circuit authority directly on point, Ninth Circuit decisions have held that the *firing* of a taser generally does not eliminate an officer's qualified immunity even when the court found that there was not a risk of harm to the officer or the public and that a reasonable person would not have used a taser in a similar situation. *See Mattos,* 661 F.3d at 448 ("although Brooks has alleged an excessive force claim, the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established. Accordingly, the defendant officers are entitled to the defense of qualified immunity against Brooks's §

1983 excessive force claim.").

Here, Officer Flam pulled his taser on Mr. Birair when he refused to follow Flam's order to remain in place on the driveway. Unlike the cases cited by Plaintiffs, it is undisputed that Officer Flam did not fire the taser at Mr. Birair. Flam did not physically touch Mr. Birair. In view of the facts that Officer Flam knew when he arrived, and what he witnessed at the home, his actions were objectively reasonable. When he drew his Taser and ordered Mr. Birair to the ground, he was doing so in reaction to the fact that Birair was not complying with Flam's instructions to remain outside.

The amount of force used here was relatively slight in that Officer Flam did not have any physical contact with Mr. Birair. Moreover, there was a strong interest in preventing Mr. Birair from entering the home based on the totality of the circumstances on the scene. Flam was reasonable in his belief that Birair was attempting to escape, as Birair stated that he was going to go into the home and he began walking toward the front door. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Moreover, Flam considered the need of DCS to safely remove the children. Even so, Mr. Birair was not physically restrained by Officer Flam, nor was he placed under arrest.[7] *See Espinosa*, 598 F.3d 528. In light of the facts available to Officer Flam, namely Mr. Birair's non-compliance with Officer Flam's instructions, Flam's actions were objectively reasonable. The Court finds that there are no material facts in dispute that would preclude granting summary judgment. Officer Flam and is entitled to qualified immunity as to this claim. Therefore, as to the excessive force claim, summary judgment is granted in favor of Officer Flam and against Plaintiffs.

### B.    Removal of the Children

Plaintiffs also argue that Officer Flam was an "integral participant" in the removal of the Birair children, and that as a result of his assisting CPS, he should be liable for the

---

[7] Officer Flam argues, somewhat indirectly, that he was aware of the possibility of a crime having occurred. *See* A.R.S. § 8-821(J) ("A person who knowingly interferes with the taking of a child into temporary custody under this section is guilty of a class 2 misdemeanor."). Based on the holding here, the Court does not need to reach this argument as it does not matter whether he believed that Mr. Birair had committed a crime. His actions were objectively reasonable.

warrantless seizure of the children. (Doc. 27 at 41-46). Plaintiffs' argument is that Officer Flam should not have relied on the representations made by the DCS employees, but rather he should have conducted his own "reasonable investigation" into the situation at the home and should have somehow prevented DCS from removing the children. (Doc. 93 at 13). Officer Flam's testimony, which is supported by his body camera footage from the scene, is that he did not participate in the decision to remove the children, that he did not participate in the removal of the children, and that he never entered the home.

Established Ninth Circuit precedent holds that "[l]aw enforcement officers and agencies are entitled to rely on one another to a certain extent." *Sjurset v. Button*, 810 F.3d 609, 621 (9th Cir. 2015); *citing Guerra v. Sutton,* 783 F.2d 1371, 1375 (9th Cir. 1986). In *Sjurset*, the Ninth Circuit held that officers who entered the home and removed children at the request of DHS without a warrant were entitled to qualified immunity and that they acted reasonably "in reliance on DHS's protective-custody determination." *Sjurset*, 810 F.3d at 619. *See also Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (declining to submit a jury instruction that would ask "to find all of the officers liable for an alleged constitutional violation merely for being present at the scene of an alleged unlawful act").

Here, it is undisputed that Officer Flam was not involved in the DCS employees' decision to remove the children from the home. He arrived at the scene after being dispatched to the home in order to make sure everyone remained safe. He continued to reiterate while at the scene that he would not assist the DCS employees in removing the children from the home and that he would not enter the home. Unlike in *Sjurset*, it is undisputed here that Flam did not enter the home. Moreover, Flam was not aware of the underlying reasons allegedly justifying the decision to remove the children, and, as Arizona law establishes, was not required to inquire about the basis. The Arizona statute related to the removal and temporary custody of children from their parents requires the cooperation of law enforcement officers when the situation requires their assistance. *See*

Ariz. Rev. Stat. § 8-456 ("Law enforcement officers *shall* cooperate with the department to remove a child from the custody of the child's parents, guardian or custodian when necessary.") (emphasis added).  Moreover, although Plaintiffs argue that Officer Flam was required to conduct an independent investigation into whether there were grounds for a warrantless removal, the parties have not identified relevant authority showing that Arizona law (or any other governing authority) requires law enforcement officers to conduct their own investigations in a DCS removal situation.

Officer Flam did not participate in the decision to remove the children from the home and had no knowledge of the circumstances of the removal.  He did not assist in the removal, nor did he enter the home.  His role at the home was to make sure that everyone stayed safe.  The Court finds that there are no material disputed facts that would preclude granting summary judgment as to this claim.  Therefore, summary judgment is granted in favor of Officer Flam and against Plaintiffs.  Officer Flam will be dismissed from this case.

## IV. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment as to liability on Counts One, Two, and Three of their Amended Complaint.  (Doc. 75).  Each of these claims asserts a Section 1983 violation in connection with the warrantless removal of their children.  Count One alleges that the children's warrantless removal was unlawful.  Count Two alleges unlawful governmental interference with familial relations.  Count Three alleges Fourth and Fourteenth Amendment violations for unlawful search and seizure.  All three claims are asserted against Kolycheck, Kramer, Torres, and Officer Flam.[8]

Defendants also move for summary judgment on these three Counts, arguing that there are no material facts in dispute and that they are entitled to judgment as a matter of law on absolute and qualified immunity grounds.  The main issue is whether or not the State Defendants had sufficient cause to remove the children from the home without a

---

[8] As the Court has already granted Officer Flam's Motion for Summary Judgment in its entirety, this section will only focus on Kolycheck, Kramer and Torres.

warrant, as it is undisputed that there was no warrant or court order to remove any of the children.

## A. Legal Standards

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)).

"Section 1983 creates a cause of action against any person who, acting under color of state law, violates the constitutional rights of another person." *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106 (9th Cir. 2001); *see* 42 U.S.C. § 1983. "Parents have a well-elaborated constitutional right to live with their children that is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016); *citing Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 1999) (internal citations omitted); *see also Burke v. Cty. of Alameda*, 586 F.3d 725 (9th Cir. 2009); *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007); *Mabe*, 237 F.3d at 1107; *Ram v. Rubin*, 118 F.3d 1306 (9th Cir. 1997); *Demaree v. Pederson*, 887 F.3d 870 (9th Cir. 2018).

Situations in which the government can remove a child from the home without a court order or warrant are very narrow. *Id.* at 878. Under Arizona law, the Department of Child Safety may take a child into temporary custody if probable cause exists to believe that the child is in imminent danger of abuse or neglect, or if the child has suffered physical injuries. A.R.S. § 8-821(B). "Under the Fourth Amendment, government officials are ordinarily required to obtain prior judicial authorization before removing a child from the custody of her parent. However, officials may seize a child without a warrant if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in *imminent* danger of *serious bodily*

*injury* and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Kirkpatrick*, 843 F.3d at 790 (emphasis added); *see also Wallis*, 202 F.3d at 1136 (Parents have a Fourteenth Amendment right against government interference with their children "without due process of law except in an emergency"). The "imminent" nature of the threat must be that "the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant*." *Demaree*, 887 F.3d at 878 (*citing Kirkpatrick*, 843 F.3d at 790). (emphasis added). "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant. *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294–95 (9th Cir. 2007) *citing Ram,* 118 F.3d at 1311. However, "an official's prior willingness to leave the children in their home militates against a finding of exigency, as does information that the abuse occurs only on certain dates or at certain times of day." *Rogers*, 487 F.3d at 1295.

### B.    Analysis

Both Plaintiffs and the State Defendants argue for summary judgment in their favor as to Counts One, Two, and Three of the FAC. Plaintiffs, claim Kolycheck, Kramer, and Torres violated their clearly established constitutional rights when the children were removed from the home without a court order and in absence of an emergency. Thus, Plaintiffs argue that immunity does not protect these state officers and that summary judgment should be entered in their favor as to these Counts.

There is no dispute that the Birair children were removed by the State Employees without a court order. Therefore, the Birair parents' rights were violated unless the State Employees can show that this was a narrow situation in which an emergency justified their removal. *See Kirkpatrick*. More specifically, the State Defendants must show that all of the children were in "imminent danger of serious bodily injury" at the time they removed the children from the home. *Id.* at 790.

The absolute and qualified immunity inquiry requires this Court to determine

whether the parents' rights to be free from removal of their children without a court order were well-established prior to the date of the removal on September 11, 2014. The Court finds that these rights, that a child could not be removed from the home absent court order without imminent danger of serious bodily injury to the child at the time of the removal, were well-established in the law at the time of removal. *See Wallis*, 202 F.3d at 1136 (Families have a "well-elaborated constitution right to live together without governmental interference"); *see also Rogers*, 487 F.3d at 1297 ("[W]e had repeatedly held that a family's rights were violated if the children were removed absent an imminent risk of serious bodily harm.").

Defendants argue that risk of bodily harm to the children was imminent, and thus that removal without a warrant was necessary. However, these arguments are belied by the Defendants own deposition testimony. Defendants further argue that "the situation was so fluid that the DCS caseworkers did not have time to consider any type of prior court order." (Doc. 80 at 4). Further, they argue that "Under Arizona law, DCS's first priority is to protect children. A.R.S. § 8-451. This is especially true since Arizona law provides a procedure by which parents can challenge CPS's actions concerning protective custody and can be heard by the juvenile court in an expedited fashion. A.R.S. §§ 8-823." (*Id.*) These arguments fail under current legal precedent and the actual facts of this case.

The leading Ninth Circuit case on point is *Rogers v. County of San Joaquin*. In *Rogers*, the Ninth Circuit granted summary judgment on a Section 1983 claim in favor of the parents and against a social worker who removed children without a warrant or court order under circumstances far worse than those present here. *Rogers*, 487 F.3d at 1295–96 (holding that "the district court correctly concluded that Tommy's bottle rot, the children's malnourishment . . . the presence of disorderliness and . . . feces . . . may increase the risk of eventual illness, but there is no indication in the record of any particular risk that the Rogers children would become seriously ill during the few hours that it would take [the social worker] to obtain a warrant.")

The State Defendants argue that "the children in *Rogers* were merely endangered

- 17 -

by apparent malnutrition, a cluttered home environment, and bottle rot," and that is distinguishable from the current facts because the Birair parents repeatedly placed their children in imminent harm of "drowning or being hit by cars." (Doc. 90 at 5). As discussed below, the undisputed facts of this case do not support Defendants' arguments.

## 1.    Kolycheck and Kramer

The most compelling statements to support Plaintiffs' argument that there was no imminent risk of substantial bodily harm justifying the removal of the children comes from the State Defendants' own testimony. Kolycheck, Kramer, and Torres were each deposed. Kolycheck was asked whether any of the children were in imminent danger of physical injury when the decision was made to remove the children on September 11, 2014.

> Question: Did you have the impression that the children were in immediate danger of physical injury?
>
> Kolycheck: Physical injury I don't – I wouldn't say specifically physical injury. But there always is that underlying concern because Mo.B. – or not Mo.B. I'm sorry – the other – Mu.B. did have the incident [falling in the pool] the night before.
>
> Question: Was there ever a time that you were concerned that Mr. or Mrs. Birair was physically abusive to their children?
>
> Kolycheck: No.
>
> Question: Were you ever – did you ever have a concern that Mr. or Mrs. Birair might be injuring their children somehow?
>
> Kolycheck: Physically, no.
>
> Question: "…in your previous visit in August, you didn't have some overwhelming concern about [the children's] development or any of that kind of information?
>
> Kolycheck: Not at that time, no.

(Doc. 76-5 at 17-20). Moreover, Kolycheck testified that at the time of removal that he had no concerns about any developmental delays with regard to A.B. or Mu.B. (Doc 76-

5 at 14). Kramer similarly testified as to the lack of imminent danger to the children at the home on September 11, 2014.

> Question: When you were in the driveway did you believe the children were in danger of imminent physical harm in the house?
>
> Kramer: At that very second, no…
>
> Question: Before you arrived and the children were there, some of the children were there with Mr. Birair, did you believe that they were in imminent physical harm during that time, that there was something imminent that was going to happen that was going to cause them injury or harm or abuse?
>
> Kramer: The concern was that father wasn't able to physically control Mo.B. during that short time frame we were there, and, with the prior history, there was a great concern about Mo.B.'s safety if father could not control him in that moment.
>
> Question: Okay. There was no threat to them of like, of physical abuse or, or danger from their parents, correct?
>
> Kramer: No.

(Doc. 94-4 at 17).

In responding to a question about the reasons for removal of the children, Kramer stated that "there was prior knowledge between Ed (Kolycheck) and Amanda Torres, the supervisor, about the case and the prior concerns and risk factors for the family. So based on that and then we saw – the things we saw in that home that day, including father's inability to properly supervise and control Mo.B. that put him at risk…the recent near drowning, that involved supervision; and then the conversation observed about services and not getting them in place in appropriate time frame is what lead to the removal of the children." (Doc. 94-4 at 19). While State Defendants attempt to characterize Kramer's actions as those of someone who was just "shadowing" Kolycheck, it is undisputed that she was a DCS employee on the date in question, responding to the Birair home as part of a DCS investigation, and her testimony establishes that she was, at least partially, involved in the decision to remove the children.

In addition to not having a concern about an imminent risk to the children in

general, the State Defendants did not establish a particularized concern as to the safety of each child. The DCS' Policy and Procedures Manual states that a "child's sibling[s] shall also be taken into temporary custody only if reasonable grounds independently exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect." (Doc. 78-2 at 20). Both Kramer and Kolycheck testified that their concerns were "primarily related to Mo.B.," but that they did not consider anything other than removing all five children. (Doc. 76-4 at 8). When asked "when you removed the Birair children, did you consider just removing Mo.B?," Kramer answered "No." (*Id*.) Furthermore, Kramer stated that she believed there were "concerns about the other children in the home, but [she] only observed what [she] saw that day and that was specifically to Mo.B." (Doc. 94-4 at 22). Lastly, the entry by Kolycheck in his report related to the safety of the children stated, "At least one child is in impending danger." (Doc. 76-8 at 15).

DCS employees are to follow the Department's Policy and Procedure Manual which lays out situations that would justify emergency intervention. (Doc. 78-2). These include situations where: No caregiver is present and the child cannot care for him or herself; a child requires immediate medical treatment of a life-threatening medical condition or a condition likely to result in impairment of bodily functions or disfigurement; a child is suffering from nutritional deprivation that has resulted in malnourishment or dehydration to the extent that the child is at risk of death; the home environment has conditions that endanger the child's health or safety, such as human or animal feces, undisposed garbage, exposed wiring, access to dangerous objects, or harmful substances that present a substantial risk of harm to the child; the child was physically injured as a result of the manufacturing of illegal drugs at the home; a doctor or psychologist has determined that a child's caregiver is unable or unwilling to provide minimally adequate care; the physical or mental condition of the parent, guardian or custodian endangers the child's health or safety. (Doc. 76-21). Both Kolycheck and Kramer testified that none of the above situations were present at the time of removal,

other than that Kolycheck stated that two of the children being locked in the bedroom could have endangered the children's health or safety. (Doc. 76-5 at 22).

DCS filed a Dependency Petition (the "Petition") on September 17, 2014 with respect to the Birair children. The Petition alleged that both parents were "unable to parent the children due to neglect. The parents are neglecting the children by failing to provide the children with the basic necessities, food, clothing, shelter, medical care and appropriate parental supervision." (Doc. 76-1). The Petition went on to say that the "parents are neglecting the children's special needs," and that the "parents lock the children in their rooms in order to prevent them from running around the home." (*Id.*) The Petition's Certification states "I, Edmond G. Kolycheck, III, being duly sworn, upon oath depose and say: I am an employee of the petitioner, the Department of Child Safety, and I have been authorized to make this verification on its behalf. I have read the foregoing Petition and believe upon information and belief that the contents thereof are true and correct." (Doc. 76-1 at 19). Kolycheck testified that he wrote most of the verified Petition, and further that he read the Petition before it was signed and submitted to the court. (Doc. 76-5 at 24).

Contrary to his sworn statements in the Petition, Kolycheck testified that, although he wrote it in the Petition to the court, he did not believe that the Birairs failed to provide food, clothing, or shelter for their children. (*Id.* at 24). Moreover, with regard to the statement that the parents lock their children in their rooms to avoid them running around the home, Kolycheck was asked:

> Question: Did the parents ever tell you that they locked the children in their rooms in order to prevent them from running around the home?
>
> Kolycheck: Not that I recall.
>
> Question: So that statement is based on the fact that the door to the bedroom was locked on September 11, 2014?
>
> Kolycheck: Correct.

Question: Any other basis for that statement?

Kolycheck: No.

(Doc. 76-5 at 25-26).

The allegations of imminent injury here are much less egregious than other warrantless removal cases where Courts have held the risk of injury was not imminent and thus that state workers were not entitled to absolute or qualified immunity. *See Rogers*, 487 F.3d at 1295–96; *see also Demaree v. Pederson*, 887 F.3d 870 (9th Cir. 2018). What is egregious here is the manner in which the decision was made to remove all five children from their parents. Without seeking a court order, and absent a situation that would lead to imminent bodily harm to one or any of the children, the State decided to remove all of them. The admissions by the state employees, particularly Defendant Kolycheck's refuting his sworn statements contained in the Dependency Petition, are extremely troubling. It is apparent to this Court that the juvenile court relied heavily on Kolycheck's sworn statement in deciding to keep the children away from their parents. What is more, these statements, that the children were being neglected and not provided food, clothing, shelter, or medical care, and that the "parents lock the children in their rooms," are misleading at best and perjury at worst.

Defendants attempt to Justify Kolycheck's false statements in the verified Petition by saying that "A dependency petition is merely a list of allegations that DCS must prove by a preponderance of the evidence to prevail on its request to have the Birair children declared dependent. *See* A.R.S. § 8-845. Thus, if DCS succeeds, as it did in this case, in proving enough of the allegations to move the juvenile court to grant the dependency petition, *it does not matter that some of the allegations turn out not to be true*." (Doc. 90 at 7) (emphasis added). This Court vehemently disagrees.

Defendants' very argument undermines the procedural safeguards of its child removal and dependency process. Defendants are obligated to provide truthful statements to a juvenile court tribunal to support their decision to remove a child or children from their parents. Here, Kolycheck's declarations, made under oath in a sworn

Petition filed in the juvenile court, were not just untrue, he knew they were false yet he made them in an apparent attempt to influence the juvenile court into finding probable cause to support his actions. And the court did. Defendants attempt to counter Plaintiffs' arguments by stating that probable cause existed as a matter of law because the "juvenile judge presiding over the dependency matter specifically found that the CPS caseworkers had probable cause to take the children into protective custody." (Doc. 80 at 4). However, this determination occurred days after the removal, and based upon the false information. Defendants' argument here utterly fails.

Moreover, in their Response in opposition to the Motion, the State Defendants, citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), argue that the Plaintiffs' Motion must fail because they have not presented evidence that the DCS workers reacted and relied upon information that was not trustworthy. (Doc. 90 at 4). This does not respond to the arguments in Plaintiffs' Motion. Indeed, Plaintiffs do not argue that the information that DCS received was untrue or incorrect in any way. Plaintiffs do argue that the State Employees violated their Constitutional rights by removing the children, without a warrant, and without an imminent risk of bodily harm to all five children. Thus, the issue before this Court is whether those reports, and the observations the DCS agents observed in reaching their decision to remove the children, rose to the level of imminent bodily harm to *all* five children. The Court finds that Defendants have not and cannot meet their burden on this record.

Defendants also argue that Kolycheck is entitled to absolute immunity based on his decision to initiate the dependency proceedings. As a general matter, child protective services caseworkers are entitled to absolute immunity for their decision to initiate dependency proceedings. *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008); *Nation v. Colla*, 841 P.2d 1370, 1377 (Ariz. App. 1991). Here, Kolycheck signed the dependency petition that initiated the proceeding (Doc. 81 at 2, ¶ 12). However, this does not provide Kolycheck with absolute immunity for his decision to remove the

children without a warrant and without an imminent risk of bodily harm to all five children.

Defendants cite the Supreme Court decision of *Saucier v. Katz* for the proposition that even if Kolycheck was mistaken in believing that he had probable cause that he is still entitled to immunity. *Saucier v. Katz*, 533 U.S. 194, 205 (2002) (reversed by *Pearson v. Callahan*, 555 U.S. 223 (2009)). However, the facts in this case, supported by his own deposition testimony, establish that Kolycheck had more than just a mistaken belief about his authority to remove the children. As the Ninth Circuit has held, officials are not entitled to immunity where they make false statements to justify their actions of removing the children. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1109 (9th Cir. 2010) (no immunity where workers made false statements in dependency proceedings); *Beltran v. Santa Clara County*, 514 F.3d 906, 908 (9th Cir. 2008) (no immunity where social workers "made false statements in a dependency petition"); *Hardwick*, 844 F.3d 1112, 1117-18 (9th Cir. 2017) (recognizing "basic constitutional right to be free from knowing presentation of false or perjured evidence").

Even without Kolychek's false statements, the State Defendants have not shown that exigent circumstances existed to justify a warrantless removal of the children. Kolycheck and Kramer both admitted, in sworn testimony, that there was no risk of imminent physical injury to the Birair children. The conditions clearly did not present an imminent risk of serious bodily harm to any child, much less all five of the children. Moreover, DCS employee Sarah Opuroko reported the previous evening, and after the near-drowning incident, that there were no concerns as to the children's safety in the home, and therefore she did not act to have the children removed. (Doc. 76-8 at 9). The lack of exigent circumstances here would have been apparent to any reasonable DCS Employee. Additionally, all parties agree that no material facts are in dispute as to these Counts. The on-scene State Employees are not entitled to qualified immunity as it relates to Counts One, Two and Three. The State Defendants violated the Plaintiffs' clearly established Fourth and Fourteenth Amendment rights by removing all five children from

the home without a court order and without an imminent risk of serious bodily harm. Therefore, the Court grants Plaintiff's Motion for Partial Summary Judgment as to Kolycheck and Kramer.

## 2. Supervisor Torres

As to Supervisor Torres, there are material facts in dispute that preclude a finding of summary judgment for either side. The State Defendants agree that Torres was "involved in the removal of the Birair children." (Doc. 90 at 2). Supervisors can be liable in situations where the supervisor knew of a constitutional violation and failed to act to prevent it. *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011) ("[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates[,]" and a sufficient causal connection between his or her wrongful conduct and the violation). Here, material facts exist at this stage of the case as to the extent of Torres' involvement. Therefore, the parties' Summary Judgment Motions as to Counts One, Two, Three and Five as to Supervisor Torres are denied.

## V. State Defendants' Motion for Summary Judgment

The final motion is the State Defendants' Motion for Summary Judgement. Based on the holding above, the only remaining claims with respect to Kolycheck, Carrion, and Padmore are Counts Five, Six, and Seven. Counts Five Six and Seven relate to the alleged continued unlawful custody of the children, unlawful interference with medical care, and alleged injuries to the children during custody. For the reasons stated below, summary judgment as to these claims will be denied.

Deposition testimony among the State Defendants as to these claims is inconsistent. For instance, while Kolycheck testified that Mr. Birair was consistently unable to control Mo.B., Carrion testified that Mr. Birair was diligent and always able to control him. (Doc. 92-6 at 13). Carrion's testimony as to the parents' minimizing the special needs of the children is also inconsistent. At times she states that there were causes for concerns for all the children, while at other times stating that there were only

concerns about a few of the children having special needs and needing additional services outside of the home.  (*Id.* at 9).

Additional facts in dispute as to these parties and claims include the justification for the continued removal of the children.  It is unclear whether Carrion had concerns of the parents' ability to supervise and care for all five children or that they were unable to supervise one or two of the children.  Additionally, the record is inconsistent with what Carrion believed with respect to her concerns about each of the children.  She testified that she did not remember the concerns she had with respect to A.B. and Ha.B. during the time that the children were removed from the home.  (Doc. 92-6 at 19).

Fact issues also remain with respect to the Plaintiffs' interference with the medical care claim.  At some point while A.B. was in State custody, he was diagnosed with penile torsion by a urologist who recommended A.B. undergo a circumcision.  (Doc. 92 at ¶ 113).  "Medical examinations are intrusions that trigger the Fourth Amendment."  *Parkes v. Cty. of San Diego*, 345 F. Supp. 2d 1071, 1093 (S.D. Cal. 2004) (*citing Yin v. State of Cal.,* 95 F.3d 864, 870 (9th Cir. 1996)).  Plaintiffs allege that they "were not notified of the examination and did not meet with the doctor."  (Doc. 91 at 24).  Further, they allege that they "were not consulted with respect to the examination or the circumcision, and they did not consent, which was their constitutional right."  (*Id.*)  Plaintiffs further allege that this procedure was authorized by Carrion.  Defendants allege that the Birair parents had full knowledge of the medical procedure and that they consented to it.  Material facts are in dispute as to this claim which precludes the Court from granting Defendants' Motion for Summary Judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Officer Flam's Motion for Summary Judgment (Doc. 71) is **GRANTED** in its entirety.  The Clerk of Court is directed to dismiss Officer Flam from this action.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 75) is **GRANTED** in part as to State Defendants Kolycheck and Kramer

and **DENIED** in part as to State Defendant Torres and Officer Flam.

**IT IS FURTHER ORDERED** that State Defendants' Motion for Summary Judgment (Doc. 80) is **DENIED** in its entirety.

**IT IS FINALLY ORDERED** that within 10 days from the date of this Order, the parties shall file their Notice of Readiness for Pretrial Conference pursuant to this Court's Rule 16 Scheduling Order (Doc. 40).

Dated this 5th day of September, 2018.

Honorable Diane J. Humetewa
United States District Judge